970 A.2d 894

**Garry Dennis CROSBY, Jr.**

v.

**STATE of Maryland.**

**No. 91, Sept. Term, 2008.**

Court of Appeals of Maryland.

May 7, 2009.

492

494

Nancy S. Forster, Public Defender, Baltimore, for Petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Baltimore), on brief, for Respondent.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, Judge.

In this case, Petitioner, Garry Dennis Crosby, Jr., questions the denial, by the Circuit Court for Harford County, of his motion to suppress evidence. Crosby contends that the tangible evidence against him was seized unlawfully when he was detained by deputy sheriffs in violation of the Fourth Amendment's guarantee against unreasonable search and seizure. Because we hold that Crosby's detention was not supported by reasonable suspicion, as required by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), we reverse the judgment of conviction by the Circuit Court.

## I.

The relevant facts [1] unfolded in the early morning hours of 16 August 2007. Harford County Deputy Sheriff Gregory Young testified that he was on patrol in an unmarked car in Edgewood, Maryland, cruising in the general area where a homicide occurred five days earlier during daylight hours. There were also reports, on the day after the homicide, of shots fired into a residence located in the same general area. According to Young, as a member of the department's Community Action Response Team ("CART"), he was assigned specially to this particular area of Edgewood because it was designated as a "hot spot." [2] At approximately 12:30 a.m., he

---

1. All facts are abstracted from the suppression hearing record in the Circuit Court.

2. According to Deputy Young, CART members are sent into "hot spot areas," which he characterized as "troubled areas in the community,"

observed a gold-colored Cadillac maneuvering in and out of parking spaces in the parking lot of an apartment complex on Windstream Way. Believing the car's movements to be suspicious, he drove towards it. As his cruiser passed the Cadillac ("driver's side door to driver's side door"), Deputy Young observed the Cadillac's driver "slumped down" in the driver's seat, giving him the impression that the driver sought to "avoid identification." [3] He immediately ran the Cadillac's tags, which revealed that the car was registered to a seventy year old woman and a forty-six year old man sharing the same address in Bel Air, Maryland. The records check did not reveal a stolen car report.

Deputy Young lost sight of the Cadillac, but, still having misgivings about the car's slouching occupant or occupants,[4] he broadcast a description of the car to other officers in the vicinity. Within minutes, he received a call from another deputy informing him that the car was at a Texaco gas station at the corner of Route 40 and Tree Top Drive, approximately one quarter of a mile from Deputy Young's then current location. He proceeded there, where he parked at an adjacent bowling alley and covertly observed the Cadillac's driver pumping gasoline into the car. When finished, the driver got back into the car and drove off of the gas station lot. Once on the road, the driver signaled a left turn onto Pulaski Highway towards Baltimore; however, before actually executing a left turn, he stopped signaling left and signaled a right turn towards Aberdeen. He turned right.

Interpreting the driver's change of turn signals as another indicator of suspicious activity, Deputy Young continued following the Cadillac from "a couple hundred yards" back, until

---

in order to "try to clean up the area and make arrests for different violations and bring the crime rate down."

**3.** Nonetheless, Deputy Young testified below that its driver appeared to him to be a male.

**4.** Deputy Young testified below that he could not see whether there was more than one person in the car.

the driver parked the car in front of a residence on Pinefield Court. He described the car's route in the following manner:

> The vehicle made several right turns, one was off Route 40 onto Edgewood Road, continued on Edgewood Road to Route 24, where the vehicle made another right-hand turn, which would have been southbound on Route 24, traveled to the intersection of Route 24 and Hanson Road, where the vehicle made a right-hand turn on Hanson Road going west toward Baltimore, to orient it. I stayed behind the vehicle at a distance just kind of observing the activity. The vehicle made a signal for a right-hand turn onto Wood-bridge Center Way, which is generally back towards the direction where I first observed the vehicle. The vehicle did not make that right-hand turn, it continued through the intersection, made the next right-hand turn, which was on Pinefield Way, and it made a left-hand turn onto Pinefield Court and stopped in front of a house ... and sat there.

Deputy Young stopped his vehicle about twenty feet behind the Cadillac and called for back-up. According to him, an additional patrol car arrived "a few seconds" later. At that time, he exited his unmarked cruiser and approached the Cadillac.[5] He informed the driver that he was "concerned about his [the driver's] activities," and asked the driver for his license and registration. According to the deputy, the driver appeared "a little shook up, seemed a little agitated." Deputy Young requested identification from the sole passenger in the car. Both complied with the requests and told the deputy that they came to the Pinefield Court address to pick up a music CD from a friend.[6] Deputy Young returned to his vehicle with the licenses and registration.

---

5. One of the facts disputed below was whether Deputy Young directed the Cadillac's occupants to stay in the vehicle. The suppression judge did not resolve this dispute.

6. Another of the facts disputed below was whether the occupants of the Cadillac asked Deputy Young not to confirm their story about the music CD with the residents of the Pinefield Court address, whom they claimed to be visiting. The suppression court did not resolve this dispute.

While he was running warrant and license checks, which revealed the driver to be Garry Dennis Crosby and the passenger to be D'Andre Antonio Feaster, a K9 unit arrived at the scene. Deputy Young asked the K9 handler to have his dog conduct a scan of the Cadillac for controlled dangerous substances. Crosby and Feaster were ordered out of the car before the scan. One of the officers at the scene informed them that he intended to pat them down. Crosby refused, demanding to know what he and Feaster were suspected of doing wrong. An officer then directed Crosby to lift up his shirt so that the officer could inspect Crosby's waistband. Crosby complied, revealing nothing of interest to the officer, and sat back down on the ground to await the completion of the K9 scan.

At some point, a dispatcher informed Deputy Young that there were no active warrants on Crosby or Feaster and that both had valid licenses. The deputy, however, held the licenses and registration while the dog continued its scan of the Cadillac.[7] The dog eventually gave a positive alert for the presence of narcotics in the car, prompting Deputy Young and other officers to conduct a search of the vehicle.[8] Their search did not yield any contraband. Young then asked Crosby whether there was any contraband in the car, to which Crosby replied that there was. The officers searched the car a second time, again to no avail.

After the second fruitless search of the car, Deputy Young began searching Crosby's person.[9] Crosby stated that he had a gun in his pocket. The deputy recovered from Crosby's

---

7. Crosby does not now, and did not below, question the constitutionality of the dog sniff or the duration of the stop.

8. Another of the facts disputed below was whether Crosby attempted to run away when the officers started searching the car. The suppression judge did not resolve this dispute.

9. Deputy Young testified that, as he searched Crosby's person, Crosby "began to roll around on the ground and try to squirm, seemingly like he was trying to get away from us." Crosby denied this. The suppression court did not render a finding of fact as to what actually happened.

pocket a loaded handgun, as well as loose ammunition. Crosby was placed under arrest and subsequently charged in the District Court of Maryland with wearing, carrying, and transporting a handgun on his person and wearing, carrying, and knowingly transporting a handgun in a vehicle.[10]

In the District Court, sitting in Harford County, Crosby moved to suppress the handgun and ammunition. The court denied the motion, and Crosby pleaded guilty to wearing, carrying, and transporting a handgun on his person. The charge of wearing, carrying, and knowingly transporting a handgun in a vehicle was placed on the stet docket. The District Court sentenced Crosby to three years imprisonment, with all but six months suspended.

Crosby noted a timely appeal to the Circuit Court for Harford County.[11] There, he again moved to suppress the handgun and ammunition recovered by Deputy Young, claiming that his detention by Deputy Young was not premised on a

---

**10.** Section 4–203 of the Criminal Law Article provides, in pertinent part:

(a) *Prohibited.*—(1) Except as provided in subsection (b) of this section, a person may not:

(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person;

(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;....

....

(2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.

....

(c) *Penalty.*—(1) A person who violates this section is guilty of a misdemeanor and on conviction is subject to the penalties provided in this subsection.

Maryland Code (2002 Repl.Vol., 2008 Supp.), Criminal Law Article, § 4–203.

**11.** In "a criminal case in which sentence has been imposed or suspended following a plea of nolo contendere or guilty, ... an appeal [of a district court judgment to the circuit court] shall be tried de novo." Maryland Code (2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 12–401(f); *see also* Maryland Rule 7–102(a).

reasonable suspicion, as required by the Fourth Amendment of the U.S. Constitution.

At the suppression hearing in the Circuit Court, Deputy Young articulated in the following manner why he decided to make contact with the occupants of the Cadillac:

> The fact that it being a high-crime area, the pulling in and out of the parking pads, that we'd had just recently [received reports of] shots being fired into a residence, I wasn't sure what was taking place.
>
> . . . .
>
> After I originally lost sight of the vehicle and put the broadcast out and a description, I was informed by Sergeant Shrader that the vehicle had been driving on Brookside Drive and the streets off of Brookside Drive where the recent homicide had just occurred. That kind of spiked my suspicion a little bit more as to why this vehicle was driving through the streets seemingly without a purpose.
>
> . . . .
>
> Adding that information to what I had observed, and then going to the gas station, which was not suspicious in itself going to the gas station, but unsure of making the left turn and then making a right turn onto Pulaski Highway, and then they had made a big loop, almost a big loop, where they could have made a left-hand turn and been just as quick to where they ended up, to where the vehicle ended up, so putting that all together I kind of felt that was a little suspicious and that's why I made contact with the vehicle.

Crosby and Feaster both testified at the suppression hearing. Feaster asserted that Crosby did not duck down in his seat when the vehicles passed, as characterized by Deputy Young. According to Feaster, "that's how people drive, people drive with they seat back. That's not slumping down when you already slumped down." [12] Feaster acknowledged that,

---

12. In his brief, Crosby states that his driving posture (as described by Feaster) is known as the "Detroit Lean." The source to which he directs our attention defines this driving style as "[d]riving with one hand on

although Young's cruiser was unmarked, he immediately recognized it as a law enforcement vehicle when the deputy drove past them on Windstream Way. When asked by the prosecutor on cross-examination whether he and Crosby "both would have recognized [Deputy Young] to be a police officer," Feaster replied affirmatively.

Crosby testified that, by the time Deputy Young took his license and registration, there were seven police vehicles at the scene. He averred that one of the officer's ordered him and Feaster out of the vehicle at almost the same time that they gave their licenses to Young. Crosby and Feaster, who are step-brothers, attested that the Cadillac was owned by a friend of Feaster's uncle and that they had permission to borrow it. They maintained that they went to the house on Pinefield Court (where they were seized by Deputy Young) in order to pick up a music CD from a friend who lived there.

■ In denying the motion to suppress, the Circuit Court observed:

[T]he issue is articulable suspicion, and the officer was able to articulate what made him suspicious. He did not claim that he thought he had the person who fired shots or the person who had committed the homicide. His testimony was that they were focused on this area because there had been a homicide five days before, and that a day later there had been shots fired, so, you know, in an area like Edge-

the wheel while slouched over to the right." *See* Urban Dictionary, http://www.urbandictionary.com/define.php?term=detroit+lean (last visited 22 April 2009). Our independent endeavor to determine whether such a phenomenon exists led us to another source: the alt-rock band, The Pretenders, who sing:

*Got motion, restrained emotion*
*I been driving, Detroit Leaning*
*No reason, just seems so pleasing*
*Gonna make you, make you, make you notice*

THE PRETENDERS, *Brass in Pocket, on* PRETENDERS (Sire 1980), *lyrics available at* Elyrics.net, http://www.elyrics.net/read/ p/pretenders-lyrics/brass-in-pocket-lyrics.html (last visited 22 April 2009).

As the song predicts, Crosby's "Detroit Leaning," if that is what he was doing, succeeded in getting him noticed.

wood, when somebody gets killed, gets more attention, so police attention is focused there.

It's 12:30 a.m., and that's a factor as well. The car is pulling in and out several times of a parking space. That draws attention. It may be innocent, it may not be, but it draws attention. Then the vehicle passes the officer and, according to the defense evidence, the occupants in the vehicle knew it was the police,[13] and the driver slumps down, giving the impression to the police officer that he does not want me to have a clear view of himself.

Then there's the aimless driving around, giving signals, changing them. Again that could be innocent, but . . . Ultimately the vehicle stops and has made, in effect, a circle, and the officer at this point says all of these factors taken together caused me to believe there was criminal activity afoot, and he approaches, asks for identification, and runs those licenses, and while he's in the process of doing that, he testified repeatedly he's in his car taking care of processing that information, only partially observed what Deputy Gerres was doing, when the K–9 officer came up and a brief scan of the vehicle brought a positive alert, and then there was probable cause.

This is really more in the nature of an accosting than a traffic stop.[14] There's no contention that he made a traffic

---

**13.** The suppression judge apparently reached this conclusion based on Feaster's testimony, in which Feaster agreed with the prosecutor that he and Crosby "both would have recognized [Deputy Young] to be a police officer" when he initially dove past them on Windstream Way.

**14.** It is clear that the suppression judge did not intend to label the encounter at issue here as an "accosting" in a strict legal sense. We have held that a "mere accosting" is the lowest level of encounters that an individual may have with the police. See Ransome v. State, 373 Md. 99, 103, 816 A.2d 901, 903 (2003). An "accosting," as ordinarily discussed in Fourth Amendment jurisprudence, does not implicate Fourth Amendment protection because such an encounter does not entail any show of authority by the police. Jones v. State, 319 Md. 279, 282, 572 A.2d 169, 171 (1990). Therefore, an accosting does not need to be supported by reasonable suspicion. Id. Here, the suppression judge noted that "the totality of the circumstances gave rise to a reasonable suspicion that criminal activity was afoot, therefore justify-

stop. The vehicle, it is undisputed, stopped not because of the police, but for whatever reasons that the driver decided to stop where he did. He said it was to get music. I believe that Deputy Young has sufficiently articulated the basis for his suspicion and that the totality of the circumstances gave rise to a reasonable suspicion that criminal activity was afoot, therefore justifying the accosting of the occupants of the vehicle to do a brief investigation.

Also the fact that the vehicle, and I don't remember if I mentioned this or not, but the fact that the vehicle is registered in Bel Air, which is a totally different community from Edgewood, so that again, the vehicle being not in Bel Air, but in a high-crime area at 12:30 in the morning, is just another factor or reason for suspicion.

So for all those reasons the motion to suppress will be denied.

(first ellipses in original).

Crosby was convicted in the Circuit Court (upon an agreed statement of facts/not guilty plea) of wearing, carrying, and transporting a handgun on his person in violation of Maryland Code (2002 Repl.Vol., 2008 Cum.Supp.), Criminal Law Article, § 4–203(a)(1)(i). He was sentenced to three years imprisonment, with all but time served suspended, as well as three years of probation.

■ Crosby noted an appeal to the Court of Special Appeals; however, because the Circuit Court was exercising its appellate jurisdiction when it rendered judgment in this case, the Court of Special Appeals did not have jurisdiction to consider his further direct appeal.[15] Accordingly, treating the

---

ing the accosting." His ruling that the encounter was supported by reasonable suspicion persuades us that he did not intend to use the word "accosting" to describe an encounter to which the Fourth Amendment does not apply.

**15.** See Maryland Code (2006 Repl.Vol.), Courts and Judicial Proceedings Article, § § 12-302, –305 to –308; see also State v. Anderson, 320 Md. 17, 26, 575 A.2d 1227, 1232 (1990) ("Section 12–305 and 12–307(2) are the only provisions authorizing further review of circuit

appeal as a petition for a writ of certiorari, the Court of Special Appeals transferred the case to us. Crosby filed a Supplemental Petition for Writ of Certiorari, challenging the denial of his motion to suppress. We granted the petition to determine whether Crosby's detention by Deputy Young was justified by reasonable suspicion.[16] *Crosby v. State*, 406 Md. 192, 957 A.2d 999 (2008). For the reasons that follow, we reverse the judgment of the Circuit Court.

## II.

When reviewing the disposition of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment to the U.S. Constitution, we view the evidence adduced at the suppression hearing, and the inferences fairly deductible therefrom, in the light most favorable to the party that prevailed on the motion. *State v. Williams*, 401 Md. 676, 678, 934 A.2d 38, 40 (2007); *Lewis v. State*, 398 Md. 349, 358, 920 A.2d 1080, 1085 (2007). In so doing, "[w]e extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly

court final judgments rendered in cases on appeal from the District Court, and they provide that there shall be discretionary review by the Court of Appeals and not an appeal to the Court of Special Appeals.")

**16.** As noted *supra* in note 14, the suppression judge apparently did not intend to hold that Crosby's encounter with Deputy Young was a "mere accosting." Nevertheless, the word choice employed by the judge provoked Crosby to brief extensively the issue of whether he actually was seized for Fourth Amendment purposes. The State, in its brief, concedes that "Crosby was ultimately seized by the police"; however, the State does not articulate a position regarding at what point during the encounter the seizure occurred, thus triggering the protection of the Fourth Amendment. Because the suppression judge, in assessing whether Crosby's detention was justified by reasonable suspicion, relied only on facts and circumstances observed by Deputy Young before he made contact with Crosby (and did not resolve the disputed accounts of some of the events that occurred after Deputy Young made contact), we shall presume, for the sake of resolving this appeal, that Crosby was seized as soon as Deputy Young made contact with him. Accordingly, we shall consider the issue of reasonable suspicion by assessing only the facts and circumstances observed by Deputy Young before he made contact with Crosby.

erroneous." *Nathan v. State,* 370 Md. 648, 659, 805 A.2d 1086, 1093 (2002) (quoting *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420, 429 (2001)). Nevertheless, in resolving the ultimate question of whether the detention and attendant search of an individual's person or property violates the Fourth Amendment, we "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Williams,* 401 Md. at 678, 934 A.2d at 40; *see also Nathan,* 370 Md. at 659, 805 A.2d at 1093 ("We review the legal questions *de novo* and based upon the evidence presented at the suppression hearing and the applicable law, we then make our own constitutional appraisal."). Our review ordinarily is limited to the record of the suppression hearing. *Lewis,* 398 Md. at 358, 920 A.2d at 1085; *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 524 (2000).

## III.

The Fourth Amendment to the U.S. Constitution prohibits unreasonable searches and seizures by the government, including seizures that involve only a brief investigative detention.[17] *Nathan,* 370 Md. at 659, 805 A.2d at 1093; *Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612, 616 (2001). The default rule requires that a seizure of a person by a law enforcement officer must be supported by probable cause, and, absent a showing of probable cause, the seizure violates the Fourth Amendment. *Nathan,* 370 Md. at 659–60, 805 A.2d at 1093. In *Terry, supra,* however, the Supreme Court recognized that a law enforcement officer may conduct a brief investigative "stop" of an individual if the officer has a reasonable suspicion that criminal activity is afoot. 392 U.S. at 17,

---

17. The Fourth Amendment provides, in relevant part:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .

 U.S. Const amend. IV. The protections of the Fourth Amendment are binding on the State of Maryland through the Due Process Clause of the Fourteenth Amendment. *Cartnail,* 359 Md. at 283, 753 A.2d at 525 (citing *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961)).

88 S.Ct. at 1878, 20 L.Ed.2d at 903. Although such encounters with law enforcement are indeed seizures as contemplated by the Fourth Amendment, the Court reasoned that the limited nature of a brief investigative stop does not demand a standard as stringent as probable cause. *Id.* at 392 U.S. at 16–22, 88 S.Ct. at 1877–80, 20 L.Ed.2d at 903–06. Accordingly, pursuant to *Terry* and its progeny, "a police officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion." *Nathan,* 370 Md. at 660, 805 A.2d at 1093.

We explained the limits of a brief investigative detention of this nature (a *Terry* stop) in the following manner:

> A *Terry* stop allows police to "investigate the circumstances that provoke suspicion." They do this by asking the "detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." The detainee is not obligated to respond, however, and, "unless the detainee's answers provide the officer with probable cause to arrest him, he must be released."

*Collins v. State,* 376 Md. 359, 368, 829 A.2d 992, 997 (2003) (internal citations omitted). A *Terry* stop may yield probable cause, allowing the investigating officer to elevate the encounter to an arrest or to conduct a more extensive search of the detained individual. *See Terry,* 392 U.S. at 10, 88 S.Ct. at 1874, 20 L.Ed.2d at 899.

In the present case, the parties do not dispute that the encounter between Crosby and Deputy Young began as a brief investigative detention, which Deputy Young could justify only upon a reasonable suspicion that Crosby was engaged in criminal activity. The State maintains that Crosby's detention was justified under the reasonable suspicion standard. That lawful encounter, the State argues, yielded probable cause to search Crosby and the Cadillac when the drug sniffing dog alerted to the presence of narcotics. Accordingly,

so the State's argument goes, the handgun and ammunition should not be suppressed. Crosby contends otherwise, asserting that the initial stop did not satisfy the relevant constitutional standard of reasonable suspicion. According to Crosby, the handgun and ammunition seized pursuant to the search of his person are fruits of the unlawful initial detention. We therefore begin (and end) our analysis by deciding whether Deputy Young had a reasonable suspicion that criminal activity was afoot when he seized Crosby.

There is no standardized test governing what constitutes reasonable suspicion. *Bost v. State*, 406 Md. 341, 356, 958 A.2d 356, 365 (2008); *Cartnail*, 359 Md. at 286, 753 A.2d at 527. "[I]t has been defined as nothing more than a particularized and objective basis for suspecting the particular person stopped of criminal activity...." *Stokes*, 362 Md. at 415, 765 A.2d at 616 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)); *see also Bost*, 406 Md. at 356, 958 A.2d at 365. Nevertheless, a rough sketch of its contours is possible. First, reasonable suspicion is a " 'common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act.' " *Bost*, 406 Md. at 356, 958 A.2d at 365 (quoting *Stokes*, 362 Md. at 415, 765 A.2d at 616). While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an "inchoate and unparticularized suspicion or 'hunch.' " *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909; *see also Cartnail*, 359 Md. at 287, 753 A.2d at 527.

Second, a court's determination of whether a law enforcement officer acted with reasonable suspicion must be based on the totality of the circumstances. *Bost*, 406 Md. at 356, 958 A.2d at 365; *Collins*, 376 Md. at 368, 829 A.2d at 998. Thus, "the court must ... not parse out each individual circumstance for separate consideration." *Ransome v. State*, 373 Md. 99, 104, 816 A.2d 901, 904 (2003). As recently articulated by the federal Court of Appeals for the Fourth

Circuit, "context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." *United States v. Branch*, 537 F.3d 328, 336 (2008); *see also United States v. Arvizu*, 534 U.S. 266, 276, 122 S.Ct. 744, 752, 151 L.Ed.2d 740, 751 (2002) (commenting that certain behavior exhibited by driver might be unremarkable on "a busy San Francisco Highway," but more significant in "a remote portion of rural southeastern Arizona"). In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged the stop at issue. *Ransome*, 373 Md. at 104–05, 816 A.2d at 904. Such deference "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273, 122 S.Ct. at 750, 151 L.Ed.2d at 749 (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629). To be sure, "[a] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Ransome*, 373 Md. at 105, 816 A.2d at 904.

 Third, the reasonable suspicion standard carries limitations; it " 'does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her.'" *Bost*, 406 Md. at 357, 958 A.2d at 365 (quoting *Ferris v. State*, 355 Md. 356, 391, 735 A.2d 491, 510 (1999)). Rather, the officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity. *See id.; Derricott v. State*, 327 Md. 582, 591, 611 A.2d 592, 597 (1992); *see also* WAYNE R. LAFAVE ET AL., SEARCH & SEIZURE § 3.8(d) (Thompson/West 3d ed. 2007) ("The officer, based upon his training and experience, is allowed to make 'inferences and deductions that might well elude an untrained person,' but if his actions are later challenged he must be able to explain those inferences and deductions so as to show that there was a

'a particularized and objective basis' for the stop."). As this Court observed previously, we shall not " 'rubber stamp' conduct simply because the officer believed he had the right to engage in it." *Ransome*, 373 Md. at 111, 816 A.2d at 908. In other words, there must be an "articulated logic to which this Court can defer." *United States v. Lester*, 148 F.Supp.2d 597, 607 (D.Md.2001).

The State places much emphasis on Crosby's slumping down in his car seat as he drove past Deputy Young on Windstream Way, arguing that it "clearly amounts to a consciousness of guilt." The State relies on the deputy's testimony that Crosby "was sitting in the seat like this, then he leaned down like in this fashion so as to avoid identification," and looks to *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), as authority for the proposition that Crosby's leaning down in the driver's seat while driving in an area that recently experienced a spike in crime was sufficient, by itself, to give rise to reasonable suspicion. We disagree with the State's favorable comparison to *Wardlow*. In that case, the police observed Wardlow standing near a building in a high crime area and holding an opaque bag. When Wardlow noticed the officers, he "fled." *Wardlow*, 528 U.S. at 122, 120 S.Ct. at 675, 145 L.Ed.2d at 575. The officers caught up to him, detained him, and discovered that his bag contained a handgun. In upholding the stop, the Supreme Court reasoned that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124, 120 S.Ct. at 676, 145 L.Ed.2d at 576. Crosby slumping down in his car seat is ambiguous conduct, hardly comparable to "[h]eadlong flight." *See id.* Also, Crosby, at the time, was driving past Deputy Young, not away from him.

Likewise, we are not so quick to embrace, as significant in our constitutional appraisal, Deputy Young's characterization of what he observed. While we credit the Circuit Court's factual finding that Crosby "slump[ed] down, giving the impression to the police officer that he [did not

want the officer] to have a clear view of him[ ]," the ultimate determination of the reasonableness of Deputy Young's characterization of what he saw is a question of law for this Court to decide.[18] *See Williams,* 401 Md. at 678, 934 A.2d at 40. In that regard, it is not readily apparent to this Court that, whenever a driver leans down in his seat, he does so to avoid being seen.[19] Moreover, "[t]his is not a case where facts observed by the police officer take on special meaning when viewed through the eyes of that officer," *see Derricott,* 327 Md. at 591, 611 A.2d at 597, as Deputy Young did not explain what caused him to believe that Crosby changed his profile to avoid being seen. *See Ransome,* 373 Md. at 109, 816 A.2d at 907 (noting that officer's suspicion was not reasonable where the officer "never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious").

The State's position that reasonable suspicion supported the detention at issue here unravels further when we consider, as we must, the totality of the circumstances. *See Arvizu,* 534 U.S. at 274, 122 S.Ct. at 751, 151 L.Ed.2d at 750 (rejecting a "divide and conquer" approach to addressing factors relied on by officer); *Bost,* 406 Md. at 356, 958 A.2d at 365 (directing an

---

**18.** In its brief, the State claims that the suppression court, by crediting Deputy Young's testimony that Crosby "was driving, sitting in the seat like this, then he leaned down like in this fashion so as to avoid identification," found as fact that Crosby's slouching was not his driving posture. We disagree. The fact that the deputy observed Crosby shift from one position to a less upright position, without more, does not generate the inference that Crosby changed positions to avoid being seen.

**19.** *State v. Cyr,* 501 A.2d 1303 (Me.1985), provides a useful counterpoint where an individual's slumping down in the driver's seat readily suggested that he wished to avoid being identified by the police. There, at around midnight, a police officer noticed a pickup truck parked, with its lights off, in the parking lot of a retail business. *Cyr,* 501 A.2d at 1305. As the officer drove by, a person seated in the driver's seat of the pickup truck ducked down. *Id.* After the officer drove past, he observed, in his rearview mirror, the pickup truck drive off. *Id.*

examination of the "whole picture"); *see also Branch,* 537 F.3d at 337 (noting that courts should take a "holistic" view toward assessing whether a *Terry* stop was supported by reasonable suspicion). The factors present do not suggest, to the degree required by the Fourth Amendment, that the driver of the Cadillac observed by Deputy Young was engaged in criminal activity, or even that his purpose in slumping down in his seat was to avoid being identified by the deputy. In other words, there was no "combination of circumstances" justifying Crosby's seizure. *See Ransome,* 373 Md. at 109, 816 A.2d at 907.

The State, not surprisingly, disagrees. It argues that Crosby's "ducking down" while driving, combined with Deputy Young's initial observation of him maneuvering in and out of parking spaces in an apartment complex parking lot, his changing of turn signals from left to right before making a right-hand turn, and the extended route that he took to end up on Pinefield Court, reasonably aroused Deputy Young's suspicions. The State also highlights the facts that it was around 12:30 a.m. when the deputy initially noticed the Cadillac, in an area designated as a "hot spot," and that the Cadillac was not registered to owners with an Edgewood address, but rather to persons in Bel Air.

 Assuming that any of these factors were, to some extent individually or together, peculiar, the constitutional test nonetheless remains whether they were suggestive of criminal activity. Here, the combination of factors, viewed in their totality, are no more indicative of criminal activity than any one factor assessed individually. *See Cartnail,* 359 Md. at 293–94, 753 A.2d at 531. Deputy Young testified only that he considered what he observed to be suspicious; he did not illuminate how his training and experience caused him to believe that what he observed revealed possible criminal activity. He acknowledged that he did not observe Crosby commit any traffic violations the entire time that he surveilled Crosby's supposedly peculiar driving behavior and route of travel. Despite driving in what Deputy Young identified as a "big

loop," Crosby signaled before each turn that he made. Thus, this Court is without an "articulated logic" with which to evaluate objectively the deputy's decision to detain Crosby.[20] *See Lester*, 148 F.Supp.2d at 607. As several courts have observed, "it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" *United States v. Wood*, 106 F.3d 942, 948 (10th Cir.1997) (quoting *Karnes v. Skrutski*, 62 F.3d 485, 496 (3d Cir.1995)); *Cartnail*, 359 Md. at 294, 753 A.2d at 531 (quoting same language); *see also Lilley v. State*, 362 Ark. 436, 208 S.W.3d 785, 791 (2005) (quoting same language). The facts that the stop at issue here occurred in the early morning hours in an

---

**20.** The State also emphasizes Feaster's testimony that he recognized Deputy Young's unmarked cruiser as a police vehicle when Young drove past the Cadillac on Windstream way. The State contends that Crosby also recognized the cruiser as a police vehicle, as evidenced by Feaster's testimony agreeing with the prosecutor that he and Crosby "both would have recognized [Deputy Young] to be a police officer." Thus, so the State suggests, Crosby's knowledge that the police were "on their trail" sheds light on his subsequent driving behavior, further adding to the reasonable suspicion mix here. We have reservations about accepting the suppression court's factual finding that the "occupants in the [Cadillac] knew it was the police." *See Nathan*, 370 Md. at 659, 805 A.2d at 1093 (noting that we do not accept facts found by the suppression court if they are clearly erroneous). Crosby did not testify on that point, and assuming Feaster intended, as the State maintains, to say that Crosby recognized Deputy Young's cruiser as a police vehicle, Feaster offered no basis for his conclusion in that regard. Additionally, we shall not assume that everyone confronted with an unmarked police cruiser would recognize it as such. Nevertheless, the issue of Crosby's knowledge here is a red herring; the facts as they were known to him are not relevant. Rather, this Court is concerned with the facts and circumstances as they appeared to a reasonable and prudent officer in Deputy Young's position. *See Stokes*, 362 Md. at 407, 765 A.2d at 616; *see also Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972) (commenting that a stop must be "reasonable in light of the facts known to the officer at the time"). Assuming that Young reasonably inferred that the driver of the Cadillac recognized him as a police officer, however, the record still does not provide reasonable suspicion that criminal activity was afoot. As stated, the deputy did not testify to any conduct that this Court perceives as indicative of criminal activity, and he did not explain how his training and experience led him to reach a conclusion different from that of an untrained observer.

area that was designated as a "hot spot," where a homicide recently occurred, and that the Cadillac was not registered to owners with an Edgewood address do not constitute ingredients that are sufficiently potent in this case to enrich the porridge to the constitutionally required consistency of reasonable suspicion. It remains a thin gruel. With regard specifically to the fact that the Cadillac was not registered to an Edgewood address, we fail to see how that adds anything to the analysis here. Deputy Young did not explain its significance.

The State looks to *Alston v. Commonwealth*, 40 Va.App. 728, 581 S.E.2d 245, 251 (2003), for the proposition that Crosby's "driving maneuvers," particularly his use of turn signals, rightfully suggested to Deputy Young that Crosby was driving evasively and that criminal activity was afoot. In *Alston*, as the car observed by the police approached the exit of the parking lot of an apartment complex, the car's driver "signal[ed] he was going to turn left upon leaving the property, abruptly turned right and almost immediately pulled to the side of the road and parked." 581 S.E.2d at 251. The driver then "quickly" exited his car and started to walk away. *Id.* Here, however, Crosby made all of his turns in accordance with his signals, although he did change his signal from left to right before making a right turn onto Pulaski Highway. Crosby also used his right turn signal well in advance if his right turn onto Pinefield Way, before turning left onto Pinefield Court. Without more, we do not view Crosby's "driving maneuvers" as evasive or otherwise suggestive of criminal activity.[21]

The present case is comparable to *Ransome v. State*, 373 Md. 99, 816 A.2d 901 (2003), which likewise involved ambiguous conduct observed by police officers in a high crime area. In that case, police were in an unmarked police car, cruising

---

21. Additionally, in *Alston*, before the driver made the abrupt right turn, the police noticed a passenger in the car, who the officers knew to be banned from the apartment complex property on which they were observed. 521 S.E.2d at 251.

an area that "produced numerous complaints of narcotics activity, discharging of weapons, and loitering." *Ransome,* 373 Md. at 101, 816 A.2d at 902. It was around 11:20 p.m. *Id.* The officers observed Ransome, who was unknown to them at the time, "either standing or walking on the sidewalk" with another individual. *Id.* As the unmarked police vehicle slowed, Ransome turned to look at it, which one of the officers interpreted as suspicious. That officer also noticed that Ransome had a "bulge" in his pocket, which the officer regarded as an indication that Ransome had a gun. The officers exited the unmarked police vehicle and approached Ransome to ask him some questions. According to one of them, Ransome was somewhat non-responsive, refused to keep eye-contact, and appeared nervous. *Id.* at 105, 816 A.2d at 904. On that basis, one of the officers conducted a pat down of Ransome for weapons, which yielded a bag of marijuana in Ransome's waist. A subsequent search of Ransome, pursuant to arrest, revealed several hundred dollars and some cocaine. *Id.* at 101–02, 816 A.2d at 902.

The sole issue for this Court in *Ransome* was whether the officers that seized Ransome had a reasonable suspicion that he was engaged in criminal activity. We answered in the negative. Commenting that "Gertrude Stein's characterization of the rose d[id] not fit," we rejected "the notion that a bulge is a bulge is a bulge is a bulge, no matter where it is, what it looks like, or the circumstances surrounding its observation." *Id.* at 107, 816 A.2d at 906. We held that the officers did not observe a "combination of circumstances justifying a reasonable belief that the bulge noticed by the officer may [have been] a weapon or that criminal activity may [have been] afoot." *Id.* at 109, 816 A.2d at 907. In doing so, we noted:

> If the police can stop and frisk any man found on the street at night in a high-crime area merely because he has a bulge in his pocket, stops to look at an unmarked car containing three uniformed men, and then, when those men alight suddenly from the car and approach the citizen, acts nervously, there would, indeed, be little Fourth Amendment

protection left for those men who live in or have occasion to visit high crime areas.

*Id.* at 111, 816 A.2d at 908. We considered it significant that the officer "never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious." *Id.* at 109, 816 A.2d at 907.

As in *Ransome,* the conduct that alerted Deputy Young was, by itself, wholly innocent. Without particularized and objective reasons that support a different interpretation of what he observed, viewed in the totality of the circumstances, Deputy Young's belief that criminal activity was afoot amounted to no more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909; *see also Cartnail,* 359 Md. at 287, 753 A.2d at 527. As explained, the Fourth Amendment does not allow for individuals to be detained on that basis. On this record, it was error to deny Crosby's motion to suppress.

*JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY THE STATE OF MARYLAND.*