REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2448

September Term, 2015

_____

ANTHONY SANTOS

v.

STATE OF MARYLAND

_____

Arthur,
Reed,
Beachley,

JJ.

_____

Opinion by Beachley, J.

_____

Filed: October 26, 2016

Anthony Santos, appellant, presents one question for our review: whether the Circuit Court for Baltimore County erred in denying appellant's motion to suppress evidence seized as a result of an illegal search. Appellant entered conditional guilty pleas to distributing heroin and possession with intent to distribute cocaine. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 30, 2014, at approximately 12:45 p.m., Detective Dominic Bridges and Sergeant George Rakowski were patrolling in an unmarked car near the Eastpoint Mall in Dundalk. Both officers were assigned to the narcotics section of the Baltimore County Police Department. While traveling on an access road around the mall, the officers observed a black car parked outside a McDonald's restaurant. Detective Bridges noticed the car because, in his experience, "drug transactions and things like that are occurring at places, public places where you can blend in." He also noted that the vehicle was parked away from the restaurant itself, though spaces were available closer to the McDonald's. Sergeant Rakowski noted that the officers knew the parking lot to be "highly concentrated for narcotics transactions."

Detective Bridges saw appellant in the driver's seat and a white female, later identified as Amanda Fitch, in the passenger's seat. He noticed that they were "looking around" and believed they were checking for the presence of police. The officers observed Ms. Fitch exit the car, enter the McDonald's restaurant, and sit at a table with a white male. Both officers noted that she was wearing pajama pants. Appellant then drove out of the

parking lot, passing the officers. The officers noticed that appellant was not wearing a seat belt and was "manipulating" his cell phone. Detective Bridges believed that everything he had observed to that point was consistent with a drug transaction. He told Sergeant Rakowski that he intended to stop the vehicle. The officers followed appellant and conducted a traffic stop in a parking lot in front of a Bank of America branch on the other side of the mall.

Detective Bridges approached the driver's side of appellant's car while Sergeant Rakowski went to the passenger's side. Detective Bridges identified himself as an undercover detective, explained the reasons for the stop, and asked for appellant's license and registration. Both officers observed that appellant was unusually nervous and "sweating profusely" even though it was "not a hot day." Detective Bridges noted that appellant was trembling; he instructed appellant to place the vehicle in park and appellant complied. Sergeant Rakowski asked appellant where he was coming from. Appellant replied that he had just come from the mall. Sergeant Rakowski then asked appellant if he had stopped anywhere or met with anyone. Appellant replied that he had not met anyone and was headed home. Because he had just seen appellant at the McDonald's with Ms. Fitch, Detective Bridges concluded that appellant was lying. Detective Bridges asked appellant to exit and move to the rear of the car.

Detectives Herr and Johnson arrived in a second vehicle within two to three minutes after the initial stop. While Detective Bridges conducted a record and registration check, Sergeant Rakowski and Detective Johnson went back to the McDonald's to try to find Ms.

Fitch. Appellant's record check revealed two possible warrants. Detective Bridges asked the precinct desk to confirm whether the warrants were active.

Meanwhile, after arriving at the McDonald's, which was "right around the corner" from the location of the traffic stop, Sergeant Rakowski went inside to look for Ms. Fitch. Unable to find her in the dining area, Sergeant Rakowski asked the manager to check the women's bathroom for a female matching Ms. Fitch's description. The manager obliged and told Sergeant Rakowski that a woman matching the description was in the bathroom. After she exited the bathroom, Sergeant Rakowski asked Ms. Fitch about "the stuff you just got from the guy in the car, the black car at the top of the hill." Ms. Fitch replied that she had "already used it." She explained that appellant had retrieved the heroin from behind the passenger's seat of the car. Sergeant Rakowski then radioed Detective Herr at the scene of the traffic stop and informed him that Ms. Fitch had admitted to buying heroin from appellant. Sergeant Rakowski estimated he made the radio report six minutes after leaving the traffic stop. According to Detective Bridges, he and Detective Herr received Sergeant Rakowski's call after appellant's license and registration had been verified, but before learning the status of appellant's warrants.

Based on the information he received from Sergeant Rakowski, Detective Bridges arrested appellant and searched his car. Detective Bridges found a modified WD-40 can containing suspected illegal drugs behind the passenger's seat. A laboratory analysis confirmed that the substances were heroin and cocaine.

At the hearing on appellant's motion to suppress evidence, appellant's counsel attempted to pinpoint the timing and sequence of the events. Detective Bridges testified that the stop occurred at 12:47 p.m. and that the warrants check came back as negative at 1:00 p.m. This testimony was based on audio recordings between the detective and police dispatch. Sergeant Rakowski testified similarly. Appellant's counsel then showed both officers the written dispatch record indicating that unit "N-120"—Sergeant Rakowski—was "in route" to an unspecified destination at 1:03 p.m. Neither officer could initially determine whether "in route" meant that Sergeant Rakowski was traveling to or from the McDonald's. Sergeant Rakowski ultimately concluded, based on the audio-record of communications, that he was at the McDonald's when he made a radio request for a marked patrol car. Sergeant Rakowski made that call at 1:01 or 1:02 p.m., fourteen to fifteen minutes after the initial traffic stop at 12:47 p.m.

Appellant also testified at the suppression hearing. He denied using his phone while driving, but acknowledged the "possibility" of not wearing his seat belt.

Based on the testimony and evidence, the circuit court denied the motion to suppress, specifically finding the testimony of both Detective Bridges and Sergeant Rakowski credible. The trial court also made the following findings of facts:

- The officers noticed appellant's car parked on the "upper lot" away from the McDonald's.

- Both appellant and his female passenger (Ms. Fitch) were "looking around."

4

- The female passenger exited the vehicle and went into the McDonald's where she "sat with a man."

- As appellant passed the officers, they noticed that appellant was not wearing a seat belt and was "manipulating his phone."

- Appellant was "nervous beyond what one would normally expect" when stopped by the officers.

- Appellant was "sweating profusely."

- When asked where he had been, appellant stated that he had been at the mall. Appellant denied having met with anyone "when, in fact, he had met with the red haired pajama bottom lady" (Ms. Fitch). Appellant provided those answers before exiting the car.

- Sergeant Rakowski left the scene of the traffic stop to go to the McDonald's before dispatch provided the record check.

- Approximately thirteen minutes elapsed between the traffic stop at 12:47 p.m. and the report at 1:00 p.m. verifying that appellant did not have any active warrants.

- Sergeant Rakowski was at the McDonald's when he requested a patrol car.

The trial court concluded that the traffic stop was a valid *Whren*[1] stop, the questions posed to appellant by the officers were "routine," and that the officers had "reasonable

---

[1] *Whren v. United States*, 517 U.S. 806 (1996).

suspicion" to detain appellant based on his answers and the officers' other observations. The trial court therefore denied the motion to suppress.

In order to preserve his right to appeal, appellant entered a conditional guilty plea to charges of distributing heroin and possession of cocaine with intent to distribute. The court accepted the plea and sentenced appellant to ten years without the possibility of parole on the distribution charge and fifteen years consecutive, but suspended, on the possession with intent charge. Appellant timely noted this appeal.

## STANDARD OF REVIEW

"When reviewing the disposition of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment . . . we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion." *Crosby v. State*, 408 Md. 490, 504 (2009). The one qualification to this general rule is that "[t]he actual findings of fact made by the hearing judge, unless clearly erroneous, 'trump' the version most favorable to the prevailing party to the extent to which they might be in conflict." *Charity v. State*, 132 Md. App. 598, 606 (2000). "Nevertheless, in resolving the ultimate question of whether the detention and attendant search of an individual's person or property violates the Fourth Amendment, we make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Crosby*, 408 Md. at 505 (internal quotation marks omitted). Here, the trial court made several specific findings of fact in denying appellant's motion to suppress. We will therefore accept these facts unless clearly erroneous. As to

all other facts and evidence, we will assume the version of the facts most favorable to the

State and make our own independent conclusions of the law.

## DISCUSSION

Our analysis begins with the so-called "*Whren*-stop." We observed in *Charity v.*

*State*, 132 Md. App. 598, 601 (2000):

> In *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L.Ed.2d 89
> (1996), the Supreme Court extended law enforcement officers a sweeping
> prerogative, permitting them to exploit the investigative opportunities
> presented to them by observing traffic infractions even when their primary,
> subjective intention is to look for narcotics violations.

In assessing the traffic stop, the only concern is whether the officer possessed sufficient

information to objectively justify the stop; the officer's subjective intent is irrelevant.

*Jackson v. State*, 190 Md. App. 497, 503 (2010). Here, the officers observed appellant not

wearing a seat belt and "manipulating" his cell phone while driving. Appellant correctly

notes that only uniformed police officers are authorized to stop motorists for seat belt

violations. *See* Md. Code (1977, 2012 Repl. Vol., 2016 Supp.) § 22-106(a) of the

Transportation Article ("TR"). At oral argument appellant conceded that there is no such

limitation for stopping a driver while using a handheld telephone. Accordingly, the trial

court correctly found that the traffic stop was justified under *Whren*.[2]

A.      Limitations of a Traffic Stop Under *Ferris v. State*

---

[2] TR § 21-1124.2(d)(2) states: A driver of a motor vehicle that is in motion may not use the driver's hands to use a handheld telephone other than to initiate or terminate a wireless telephone call or to turn on or turn off the handheld telephone.

In *Ferris v. State*, 355 Md. 356, 369 (1999), the Court of Appeals explained the

limitations imposed upon law enforcement after a valid traffic stop:

> The Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention. *United States v. Mendenhall*, 446 U.S. 544, 551, 100 S. Ct. 1870, 1875, 64 L.Ed.2d 497 (1980). The Supreme Court has made clear that a traffic stop involving a motorist is a detention which implicates the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (analogizing the degree of intrusiveness of the usual traffic stop to the degree of restraint imposed by the typical *Terry* stop). It is equally clear, however, that ordinarily such a stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation. *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Nonetheless, the Supreme Court has also made it clear that the detention of a person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).

The Court further explained that,

> the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *See Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.

*Id*. at 372. It is that second component – reasonable articulable suspicion – that formed

the basis of the trial court's ruling in this case and to which we turn our attention.

### B.     Reasonable Articulable Suspicion Under *Terry*

The officers detained appellant at 12:47 p.m. for two traffic violations. Almost immediately, the status of appellant's detention embarked upon a parallel track of a *Terry* investigation for a narcotics violation. In *State v. Ofori*, 170 Md. App. 211, 245 (2006), we recognized the potential for a second, independent justification for a detention:

> The caselaw universally recognizes the possibility that by the time a legitimate detention for a traffic stop has come to an end, or more frequently while the legitimate traffic stop is still in progress, justification may develop for a second and independent detention. Unfolding events in the course of the traffic stop may give rise to *Terry*-level articulable suspicion of criminality, thereby warranting further investigation in its own right and for a different purpose.

And in *Jackson*, 190 Md. App. at 515, we further explained:

> There is no logically sound reason why at any point in the course of a traffic stop, articulable suspicion might not achieve critical mass for a *Terry* criminal investigation. If such articulable suspicion may develop in the total absence of a traffic stop, it may as readily develop in the course of one. From that point on, the processing of 1) the traffic infraction and 2) the *Terry* investigation for narcotics involvement may proceed simultaneously on parallel tracks. The time limit for processing the traffic infraction, to be sure, might run its course before the *Terry* drug investigation time limit runs out; but the detention itself will still be reasonable as long as either of its justifying rationales, the old one or the new one, remains vital.

As in *Jackson*, the traffic stop and detention of appellant in this case almost immediately morphed into a parallel *Terry*-stop. The trial court found reasonable suspicion under *Terry* rather than the ripening of probable cause to arrest while waiting for the records check. While we may decide a suppression issue on any legal basis supported by the facts, we will limit our *de novo* constitutional review in this case to the *Terry*-based justification for the detention.

1.    Articulable Suspicion for a Narcotics Violation

Whether the police have reasonable articulable suspicion to investigate further is based on the totality of circumstances. The Supreme Court unanimously articulated that standard in *United States v. Arvizu*:

> When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."*

534 U.S. 266, 273 (2002) (emphasis added) (citations omitted).

With this framework, we turn our attention to the present case. Officers first noticed appellant because he had parked away from the McDonald's despite closer parking spaces being available. Sergeant Rakowski testified that he knew the parking lot to be "highly concentrated for narcotics transactions." Detective Bridges testified that appellant and Ms. Fitch were "looking around"; inferentially, he believed they were checking the area for the presence of police officers. Ms. Fitch exited the vehicle, went into the McDonald's, and sat down at a table with a male. Based on his training and experience, Detective Bridges believed he was observing a drug transaction.

After performing the traffic stop, Detective Bridges noticed appellant sweating profusely and trembling. Sergeant Rakowski testified that appellant had "sweat rolling down his face," which he believed to be abnormal. Detective Bridges testified what occurred:

[STATE]: Okay. Based on the observations that you just described, what happened next? Or what did you ask him to do, if anything?

[DETECTIVE]: Sergeant Rakowski had asked him some questions and after that occurred, we asked him to step out of the vehicle.

[STATE]: Okay. Do you recall what questions were asked?

[DETECTIVE]: I do.

[STATE]: What, what did he ask him?

[DETECTIVE]: I don't remember the specific words that were used, but Detective Sergeant Rakowski asked where he was coming from and the [appellant] said that he was leaving the mall or he had just come from the mall and which I took notice of because he was coming from a McDonald's restaurant and then Sergeant Rakowski said, well, did you meet with anybody or who were you just talking with and he said no, I didn't meet with anybody, I'm headed home.

[STATE]: And that was inconsistent with what you just observed?

[DETECTIVE]: Exactly.

[STATE]: Okay.

[DETECTIVE]: I, obviously, had just seen that that was false.

The officers then asked appellant to exit the car.

The trial court found both officers credible and made specific findings of fact. It concluded that, under the totality of the circumstances, the police had reasonable articulable suspicion to detain appellant for further investigation. We agree.

Although a totality of the circumstances analysis is unique to each case, case law informs our decision. In *Jackson*, the defendant was stopped for speeding on Interstate 95. *Jackson*, 190 Md. App. at 502. During the course of the traffic stop, a K-9 unit scanned

defendant's car and alerted for the presence of drugs. *Id*. at 504. This Court ultimately held that the K-9 scan occurred while the traffic violation was still being processed and therefore the stop was not unreasonably prolonged. *Id*. 514. However, we further held that, even if the detention were excessive under *Whren* and its progeny, the officer still had reasonable articulable suspicion to detain the defendant. *Id*. We considered the following factors as part of that analysis: defendant's extreme nervousness, the presence of multiple air fresheners and cell phones (hallmarks of drug trafficking), the location of the stop in a known drug area, the use of a rental car with out-of-state tags, and defendant's illogical explanation for where he had been. *Id*. at 519-24.

The last factor carried particular weight. The defendant claimed that "he was coming from Hagerstown, Maryland and had stopped at the Baltimore Travel Plaza." *Id*. at 524. The officer became immediately suspicious because "[defendant] was North of where he said he was traveling from and traveling Southbound." *Id*. We described this as being "irremediably suspicious," noting, "That the appellant was self-evidently caught in, to put it gently, an awkward quandary was another factor, and a big one, in the totality that added up to reasonable articulable suspicion." *Id*. at 525.

In *Carter v. State*, 143 Md. App. 670 (2002), police received an anonymous call about a suspicious vehicle parked on the parking lot of an elementary school. *Id*. at 680. The caller stated that individuals were possibly selling drugs and that juveniles were approaching and leaving the vehicle. *Id*. When the police arrived six minutes after the call, they observed two individuals walking away from a van, the only vehicle on the lot.

*Id*. at 681.  The two individuals began running as the police approached.  *Id*.  The officers stopped the van as it attempted to exit the lot.  *Id*.  What occurred after the stop aids our analysis:

> In the first minutes of the stop, moreover, articulable suspicion of drug activity continued to mount.  The driver, for starters, could not produce an operator's license.  The driver was then asked what the van was doing on the school parking lot at that hour.  He stated that he and the others were on the parking lot for the purpose of "picking someone up."  He was unable to state, however, who that person to be picked up was or how they would know him.  The front seat passenger was independently asked by another officer why the van and its occupants were on the school property lot.  By contrast with the driver's explanation, he explained that they were there for the purpose of just "hanging out."

*Id*. at 682.  The *Carter* Court noted the significance of inconsistent statements in *Terry*-stop analysis:

> The fundamental purpose of a *Terry*-stop, based as it is on reasonable suspicion, is to confirm or to dispel that suspicion by asking for an explanation of the suspicious behavior.  A major factor in then determining whether to terminate or to prolong the *Terry*-stop, therefore, is necessarily the nature of the response or responses given to the police.

*Id*. at 683-84.

In *United States v. Mason*, 628 F.3d 123 (4th Cir. 2010), the United States Court of Appeals for the Fourth Circuit held that an officer had reasonable articulable suspicion based on the totality of the circumstances.  The officer there made the following observations:

- The defendant driver did not pull his vehicle over promptly.

- The officer detected an "extreme" odor of air fresheners.

- There was only a single key on the defendant's key ring (leading the officer to conclude that the defendant and his passenger may have been on a "turnaround" trip as drug couriers).

- Defendant was sweating and unusually nervous.

- Defendant and his passenger gave conflicting stories about where they had stayed and the purpose of their travel.

*Id.* at 130-31.

In finding reasonable articulable suspicion, the Fourth Circuit noted the significance of the conflicting stories provided by the defendant and his passenger:

> We recognize that several of these facts could hardly have distinguished suspicious activity from innocent travel. But when all the articulated facts are taken as a whole, *especially when they include the fact of Mason and Govan's conflicting stories about the place where they stayed and the purpose of their travel,* sufficient facts existed to have given an experienced officer a reasonable suspicion that criminal activity was afoot.

*Id.* at 129 (emphasis added).

Turning to the case at bar, there might have been an innocent explanation for appellant parking in the upper lot away from the McDonald's. There might have been an innocent explanation for appellant and Ms. Fitch "looking around" while seated in the vehicle. It is certainly understandable that appellant was nervous when he was stopped by the police. It is even conceivable that appellant had an innocent explanation for lying to the police about where and with whom he had been minutes before the stop. Nevertheless, as explained by the Supreme Court in *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989), reasonable suspicion can develop from "'a series of acts, each of them perhaps innocent'

if viewed separately, 'but which taken together [warrants] further investigation.'" We also note the Supreme Court's observation in *Arvizu* that reasonable suspicion determinations allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them" that might not be readily apparent to an untrained person. 534 U.S. 266, 273 (2002). The circumstances in this case, taken together, sufficed to form reasonable articulable suspicion and permitted the officers to further investigate.

Appellant argues that the officers exceeded the permissible scope of the traffic stop when they asked appellant where and with whom he had been. In appellant's view, those questions were improper because they were wholly unrelated to the traffic stop. We are persuaded by the Fourth Circuit's response to that contention as recounted in *Mason*:

> There is no support in Fourth Amendment jurisprudence for the notion that questioning unrelated to the purpose of a traffic stop requires reasonable suspicion, provided that the questioning occurs within the timeframe reasonably necessary to effectuate the traffic stop. An officer's questions or actions during the course of a traffic stop or any other legal detention need not be solely and exclusively focused on the purpose of that detention. In *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 788, 172 L.Ed.2d 694 (2009), a unanimous Supreme Court noted just that:
>
> > A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop . . . . *An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.*

628 F.3d at 131 (internal citations omitted). Here, the unrelated questions posed by the officers to appellant did not measurably extend the duration of the traffic stop. Indeed, those questions were asked within minutes of the stop, clearly before any traffic citation could be written or record check completed. It is this fact that distinguishes this case from *Charity* where we held that inconsistent stories provided by the defendant and his passenger "were all post-*Whren* phenomena." 132 Md. App. at 631.[3]

In summary, we hold that, under the totality of the circumstances, the trial court correctly ruled that the police had reasonable articulable suspicion that drug activity was afoot. Hence, appellant was properly detained while the officers further investigated their suspicions.

### 2. The Duration of the Stop

The final issue – the duration of the detention – requires little discussion. The constitutional duration of a *Terry*-stop varies dramatically from that of a traffic stop generally, including *Whren*-inspired stops. *Carter*, 143 Md. App. at 692. Under *Ferris*, once the purpose of the traffic stop is fulfilled, further detention is not permitted. *Ferris*, 335 Md. at 372. With *Terry*-stops, the inquiry is whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "The permitted duration of a *Terry*-

---

[3] Appellant also cites *Whitehead v. State*, 116 Md. App. 497 (1997) for the proposition that the officers unnecessarily prolonged the traffic stop. We note that *Whitehead* focuses on a lack of probable cause; there is minimal *Terry* analysis.

stop cannot be measured by the clock alone." *Carter*, 143 Md. App. at 692. Where reasonable suspicion quickly appears after a *Whren* traffic stop as in the present case, the rules pertaining to *Terry*-stops take over. The inquiry shifts to whether the police pursued their investigation from that point in a diligent and reasonable manner.

Applying that standard to this case, the answer is clear. Armed with reasonable suspicion minutes after the traffic stop, Sergeant Rakowski and Detective Johnson went to the McDonald's to locate Ms. Fitch. With the assistance of the restaurant manager they quickly found her. Ms. Fitch confirmed that she had purchased heroin from appellant. Sergeant Rakowski then radioed Detective Herr, who was at the scene of the traffic stop, to advise Detective Herr about Ms. Fitch's admission. Sergeant Rakowski estimated that he made this radio call within six minutes of leaving the traffic stop. Specifically, Sergeant Rakowski testified that he made the call for a marked police car at 1:01 or 1:02 p.m. while still at the McDonald's after talking to Ms. Fitch. Given that the traffic stop occurred at 12:47 p.m. and Sergeant's Rakowski made his call for a patrol car at 1:02 p.m., at the latest, it is clear that the officers had confirmed their suspicions within fifteen minutes. We conclude that the officers here pursued their on-going *Terry* investigation in a diligent and reasonable manner.[4]

---

[4] It is arguable that probable cause to arrest ripened within the constitutionally permissible time frame articulated in *Ferris*. Detective Bridges testified he received Sergeant Rakowski's radio call about Ms. Fitch's admission of a drug deal *before* Detective Bridges learned the status of appellant's warrants. The trial court did not make any finding of fact on this issue and did not deny the motion to suppress on this basis. We find it unnecessary to resolve this question. Viewing the evidence in a light most favorable to the State,

Finding no constitutional infirmity, we affirm the trial court's denial of appellant's

motion to suppress.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**

---

however, it would appear that the *Ferris* clock had not expired prior to the ripening of probable cause to arrest.