COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Annunziata and Clements
Argued at Richmond, Virginia


GREGORY TYRONE ALSTON
                                              OPINION BY
v.    Record No. 3442-01-2      JUDGE JEAN HARRISON CLEMENTS
                                              JUNE 3, 2003
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Thomas N. Nance, Judge

            David M. Gammino for appellant.

            Marla Graff Decker, Senior Assistant Attorney
            General (Jerry W. Kilgore, Attorney General,
            on brief), for appellee.


        Gregory Tyrone Alston was convicted on his conditional

guilty plea of possession of more than one-half ounce but less

than five pounds of marijuana with intent to distribute, in

violation of Code § 18.2-248.1.  On appeal, Alston contends the

trial court erred in denying his motion to suppress the

marijuana found on his person and in his car as the product of

an unlawful seizure that violated his Fourth Amendment rights.

Finding no error, we affirm the judgment of the trial court.

                        I.  Background

        In reviewing a trial court's denial of a motion to suppress,

we view the evidence and all reasonable inferences fairly

deducible from that evidence in the light most favorable to the

Commonwealth, the party prevailing below.  See Weathers v.

<u>Commonwealth</u>, 32 Va. App. 652, 656, 529 S.E.2d 847, 849 (2000).

So viewed, the evidence presented in this case established that on July 27, 2001, Richmond City Police Officer Brian Hixson was on routine patrol with Officer Timothy DeGrauwe and Officer Durham. The three officers were in one patrol car, which Hixson was driving. At approximately 10:55 a.m., the officers pulled into the property known as the Ruffin Road apartment complex. The apartment complex was posted with "no trespassing" signs.

After driving approximately fifty yards into the complex, Hixson observed a purple Nissan car in the complex "come around the corner" and head in the officers' direction. Alston, whom Hixson did not know at the time, was driving the car, and there were two passengers in the rear seat and one in the front seat. As Alston drove by the patrol car, Hixson recognized the passenger in the front seat as Pierre Stanberry, someone who Hixson knew had been banned by court order from entering the Ruffin Road apartment complex. Hixson had previously arrested Stanberry for trespassing on that property at least twice, the last time occurring in September or October of 2000. Hixson turned the patrol car around to investigate Stanberry's presence in the complex. The officers observed Alston pull up to Ruffin Road at the entrance/exit of the apartment complex and activate his turn signal "indicating [he was] going to make a left-hand turn" onto Ruffin Road. Then, "[a]ll of a sudden[,] the left turn signal went off and [Alston] made a quick right

- 2 -

turn" onto Ruffin Road.  Almost immediately, Alston pulled to the side of the road directly in front of a parked car, parked, and "quickly" got out of the car and started walking away.

Hixson, who had followed Alston onto Ruffin Road, pulled over next to Alston's car, stopping in the road.  He then stepped out of his vehicle and "asked" Alston, who had walked "into the roadway, right in front of [the police] vehicle," to "have a seat back in his car."  Because the patrol car was "in the travel lane of Ruffin Road," Hixson activated the car's emergency lights at some point.[1]

Complying with Hixson's request to return to his car, Alston went back to his car and got in.  Hixson then approached Alston's car and immediately noticed a "box of open sandwich baggies" and an "open beer" in the car's center console.  He also smelled the odor of marijuana emanating from the car.

Hixson asked Alston for identification, which Alston provided.  Returning to the patrol car, Hixson ran Alston's information through "Richmond-Henrico NCIC" and learned that Alston had an outstanding warrant on file with the City of Richmond.  Hixson arrested Alston on that warrant.

---

[1] Hixson acknowledged at the suppression hearing that the patrol car's emergency lights were activated during the course of the investigation.  However, he could not recall whether he activated the emergency lights before or after he asked Alston to return to his car.  Alston testified that he did not "remember [the] emergency lights being on."

Incident to that arrest, Officer Durham searched Alston and his car.  As a result of the search, Durham found marijuana on Alston's person and in his car.  Additional charges were then brought against Alston.  Pierre Stanberry was also charged with several offenses, including trespassing.

On cross-examination at the suppression hearing, Hixson acknowledged that, as far as he knew, Alston was legally parked and had not engaged in any criminal activity when he asked him to get back in his car.  He further acknowledged that his investigation of Stanberry's trespassing would not have been hindered if Alston had left because he could have gone directly to Stanberry, who stayed in the car, and asked him questions.  When asked to describe the "reasonable and articulable suspicion" that served as the basis for having Alston get back in his car, Hixson explained, "It seemed suspicious to me the way he pulled out of the complex and then just pulled over right in front of the complex that he had just exited from, and then he quickly got out of the vehicle and walked."  Hixson further testified:  "It all seemed very suspicious to me.  Mr. Stanberry I knew was banned from the property.  I knew him by name, and I just asked Mr. Alston to have a seat back in the vehicle."

Officer DeGrauwe, who was called as a witness for Alston, testified that, when he saw Alston get out of his car and start to walk "across the street," he got out of the patrol car and "got ready to run" after him, because, based on his training and

- 4 -

experience, that was what normally happened under such circumstances. When asked to explain the circumstances that made him believe that Alston was going to try to run away, DeGrauwe stated that Alston's "quick right turn" after signaling to turn left, his pulling over suddenly and parking, and his getting out of the car are occurrences that are generally followed by "a foot pursuit." Ultimately, however, he did not have to pursue Alston, DeGrauwe stated, because "Officer Hixson looked at [Alston] and said get back in the car," and Alston, who was approximately ten feet away, complied.

Alston testified at the suppression hearing. According to his testimony, he had never been banned from the Ruffin Road apartment complex and did not know that Stanberry, his cousin, had been. On the day in question, he had been visiting another cousin who lived at the apartment complex. When he was leaving the complex, she called on his cell phone to tell him he had left something at her place. He immediately pulled over to the side of the road, parked, and had started to walk the short distance back to his cousin's apartment when the police pulled up. One of the "three or four" officers who were there "told [him] to get back in the car." Believing, based on the officer's tone of voice, that he was not free to leave, he got back in the car, as ordered.

Alston admitted that he had missed an earlier court date and that he knew he had an outstanding warrant for failure to

appear. He admitted there was a can of beer in his car but denied it was open. He also denied that there were "baggies" in the car or that anyone in the car had been smoking marijuana.

In a pretrial motion, Alston moved to suppress the marijuana as the product of an unlawful seizure. Ruling that, under the circumstances of this case, Hixson could ask Alston to get back in his car in order "to secure the situation just long enough to find out what [was] going on," the trial court denied Alston's motion to suppress.

Alston then entered a conditional plea of guilty, preserving his right to appeal the trial court's denial of his motion to suppress. Upon that plea, the trial court found Alston guilty of possession of more than one-half ounce but less than five pounds of marijuana with the intent to distribute and sentenced him to thirty-six months of incarceration, with thirty months suspended for a period of five years on certain conditions. This appeal followed.

## II. Analysis

"In reviewing a trial court's denial of a motion to suppress, '[t]he burden is upon [the defendant] to show that th[e] ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (alterations in original) (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

"'Ultimate questions of reasonable suspicion and probable cause to make a warrantless search' involve questions of both law and fact and are reviewed de novo on appeal." Id. (quoting Ornelas v. United States, 517 U.S. 690, 691 (1996)). However, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Id. at 198, 487 S.E.2d at 261 (citing Ornelas, 517 U.S. at 699).

Encounters between the police and citizens "generally fall into one of three categories." Id.

> First, there are consensual encounters which do not implicate the Fourth Amendment. Next, there are brief investigatory stops, commonly referred to as "Terry" stops, which must be based upon reasonable, articulable suspicion that criminal activity is or may be afoot. Finally, there are "highly intrusive, full-scale arrests" or searches which must be based upon probable cause to believe that a crime has been committed by the suspect.

Id. (citations omitted) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

Alston contends he was unlawfully seized under Terry v. Ohio, 392 U.S. 1, 16 (1968), when Officer Hixson stopped him from walking away by ordering him back to his car. At that moment, Alston argues, Hixson did not have grounds to support a reasonable, articulable suspicion that he was engaged in criminal activity. The officer's observation of his

"commonplace" driving behavior, his walking away from his lawfully parked car, and his having someone in his car who was suspected of trespassing, gave rise, at best, Alston maintains, to a mere inchoate hunch that he was engaged in criminal activity. Thus, Alston concludes, Officer Hixson violated his Fourth Amendment rights in ordering him back to his car and the trial court erred in refusing to suppress the subsequently discovered marijuana, a product of the unlawful seizure.

The Commonwealth contends Alston was not seized for Fourth Amendment purposes until he was arrested on the outstanding warrant. Prior to that, the Commonwealth argues, the encounter between Officer Hixson and Alston was entirely consensual.

Assuming, without deciding, that Alston was "seized" within the meaning of the Fourth Amendment when Officer Hixson stopped him from walking away, we agree with the trial court that, on the facts of this case, that seizure was not in violation of Alston's Fourth Amendment rights because Hixson was entitled to briefly detain Alston for investigative purposes in order to question him and maintain the status quo.

"The Fourth Amendment does not forbid all . . . seizures but only those that are unreasonable." Cabbler v. Commonwealth, 212 Va. 520, 522, 184 S.E.2d 781, 782-83 (1971) (citing Terry, 392 U.S. at 9). Whether a seizure is unreasonable under the Fourth Amendment depends on "the particular facts of [the] case."

Harris v. Commonwealth, 262 Va. 407, 414, 551 S.E.2d 606, 609 (2001).

"[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." Hayes v. Florida, 470 U.S. 811, 816 (1985). Indeed, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 143, 146 (1972). Moreover,

> an officer need not suspect an individual of a particular crime in order to justify a Terry stop. A general suspicion of some criminal activity is enough, as long as the officer can, based on the circumstances before him at the time, articulate a reasonable basis for his suspicion.

Hatcher v. Commonwealth, 14 Va. App. 487, 490, 419 S.E.2d 256, 258 (1992). Likewise, "[a]ctual proof that criminal activity is afoot is not necessary; the record need only show that it may be afoot." Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992). The investigatory stop, however, "must be based on something more than the officer's 'inchoate and unparticularized suspicion or "hunch."'" Ramey v. Commonwealth, 35 Va. App. 624, 629, 547 S.E.2d 519, 522 (2001) (quoting Terry, 392 U.S. at 27).

We are further mindful in assessing an officer's justification for a seizure that "[t]here are no bright line rules to follow when determining whether a reasonable and articulable suspicion exists to justify an investigatory stop." Hoye v. Commonwealth, 18 Va. App. 132, 135, 442 S.E.2d 404, 406 (1994). As the Supreme Court stated in Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000):

> In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

In deciding whether to make an investigatory stop, "an officer is 'entitled to rely upon "the totality of the circumstances—the whole picture."'" Pequese v. Commonwealth, 19 Va. App. 349, 351, 451 S.E.2d 412, 413 (1994) (en banc) (quoting Lansdown v. Commonwealth, 226 Va. 204, 212, 308 S.E.2d 106, 112 (1983) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981))). The police officer is also entitled "to view the circumstances confronting him in light of his training and experience, and he may consider any suspicious conduct of the suspected person." James v. Commonwealth, 22 Va. App. 740, 745, 473 S.E.2d 90, 92 (1996). "[A] trained law enforcement officer may [be able to] identify criminal behavior which would appear

innocent to an untrained observer." Taylor v. Commonwealth, 6 Va. App. 384, 388, 369 S.E.2d 423, 425 (1988).

Applying these principles to the present case, we conclude that, based on the totality of the circumstances confronting him, Officer Hixson acted reasonably in stopping Alston from walking away and asking him to return to his car.

Hixson initially observed Alston driving on property that was posted "no trespassing." As Alston drove by the patrol car, Hixson saw a passenger in the car who he knew had recently been barred from the property. On the basis of that observation, Hixson had a reasonable and articulable suspicion that the passenger in Alston's car was trespassing. Hixson was therefore entitled to stop Alston's vehicle in order to investigate the suspected criminal activity. See Freeman v. Commonwealth, 20 Va. App. 658, 660-61, 460 S.E.2d 261, 262 (1995) (noting that "[a] police officer may stop the driver or occupants of an automobile for investigatory purposes if the officer has 'a reasonable articulable suspicion, based on objective facts, that the individual is involved in criminal activity'" (quoting Jacques v. Commonwealth, 12 Va. App. 591, 593, 405 S.E.2d 630, 631 (1991))).

Intending to conduct such an investigatory stop, Hixson turned his patrol car around and proceeded after Alston's car. However, before the officer could initiate the stop, Alston, after signaling he was going to turn left upon leaving the

property, abruptly turned right and almost immediately pulled to the side of the road and parked.  Alston then "quickly" got out of his car and started to walk away.  Hixson pulled up next to Alston's car and, finding Alston's conduct "suspicious" asked him to return to his car.

We conclude that Alston's behavior reasonably suggested that criminal activity may be afoot.  In light of Alston's evasive driving maneuvers after passing Hixson's patrol car and his quick exit and departure from his parked car, a reasonable officer could conclude that Alston sought to avoid contact with the police in order to elude their investigation.  See Hatcher, 14 Va. App. at 490, 419 S.E.2d at 258 (finding that a passenger of a lawfully stopped car who walked away from the car did so to evade the police officer's investigation).  Hence, Hixson's observations of Alston's suspicious conduct provided him with a reasonable basis independent of the passenger's suspected trespassing to believe that Alston also might be involved in criminal activity.

Alston argues that his behavior was consistent with innocent conduct and showed "no indicia of criminal activity."  We find, however, that, taken together as a whole, Alston's actions after he drove by the patrol car were sufficiently suspicious to provide Hixson with the requisite reasonable and articulable suspicion to stop Alston from walking away from the scene.  See Terry, 392 U.S. at 22-23 (concluding that defendant's "series of

acts, each of them perhaps innocent in itself," in combination warranted further investigation by the police). Hixson's brief detention of Alston was therefore reasonable to allow the officer to confirm or dispel his suspicion and to maintain the status quo during the course of the lawful roadside investigatory stop. See Hatcher, 14 Va. App. at 491-92, 419 S.E.2d at 259 (holding that a police officer's brief detention of a passenger who walked away from a lawfully stopped vehicle is warranted to promote the officer's "significant interest in gaining control of and monitoring a potentially hazardous roadside stop in order to conduct his lawful investigation," particularly when "events subsequent to the lawful traffic stop focus suspicion on [the] passenger"); see also United States v. Mancillas, 183 F.3d 682, 698 (7th Cir. 1999) (finding that a police officer had reasonable suspicion to stop and briefly detain the defendant based, in part, on the defendant's "quickly" exiting and walking away from his vehicle in a parking lot when the officer, responding to a radio dispatch, arrived at the parking lot and illuminated the defendant's vehicle with a spotlight).

Alston further contends that, even if Hixson had grounds to support a reasonable and articulable suspicion that he was engaged in criminal activity, the officer could only detain him briefly "at the point where he stood, after he immediately stopped when hailed by the police." By ordering him back into

the confines of the car, Alston argues, Hixson transformed any possible investigatory detention into a custodial seizure requiring probable cause, which, at that point, did not exist.

We disagree with Alston that, by asking him to get back into his car rather than questioning him outside the car "where he stood," Hixson changed the nature of the detention from an investigatory stop into a full-fledged arrest. "The perception . . . that one is [in custody] is insufficient to convert a Terry stop into an arrest. A brief but complete restriction of liberty is valid under Terry." United States v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1987). For example, an investigatory stop does not necessarily become a custodial arrest when circumstances cause a police officer to draw his gun upon a suspect. See Harris v. Commonwealth, 27 Va. App. 554, 562, 500 S.E.2d 257, 261 (1998).

Moreover, "[c]ourts have routinely allowed officers to insist on reasonable changes of location when carrying out Terry stops." United State v. White, 648 F.2d 29, 37 (D.C. Cir. 1981). Indeed, it is well established that police officers who are conducting a lawful investigatory stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). The personal safety of the driver and other occupants of a lawfully stopped vehicle is also a legitimate concern for the police. See Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977).

Thus, "[f]ollowing a lawful traffic stop, the Fourth Amendment permits the police to order the passengers to get out of the car pending the completion of the stop."  Harris, 27 Va. App. at 562, 500 S.E.2d at 261 (citing Maryland v. Wilson, 519 U.S. 408, 414 (1997)).  Likewise, we have "previously held that police officers may . . . detain passengers beside an automobile until completion of a lawful traffic stop."  Id. (citing Hatcher, 14 Va. App. at 491-92, 419 S.E.2d at 259).  The police may also order the driver to exit the car, see Mimms, 434 U.S. at 111 n.6, and it follows that "a police officer has the power to reasonably control the situation by requiring [an occupant of the vehicle] to remain in [the] vehicle during a traffic stop."  Rogala v. District of Columbia, 161 F.3d 44, 53 (D.C. Cir. 1998).  These additional intrusions upon the personal liberties of the occupants of the vehicle, who "'are already stopped by virtue of the [lawful] stop of the vehicle,'" are "de minimis" and are reasonable under the Fourth Amendment because of the "'weighty [public] interest in officer safety'" and the need to "maintain the status quo during the course of the investigatory traffic stop."  Harris, 27 Va. App. at 562, 500 S.E.2d at 261 (quoting Wilson, 519 U.S. at 414).

Applying these principles to the circumstances of the present case, we conclude that Officer Hixson did not violate Alston's Fourth Amendment rights by having him get back in his car before questioning him.  In doing so, Hixson took steps that

were reasonably necessary not only to protect Alston, himself, and his fellow officers from the dangers inherently associated with a roadside stop but also to maintain the status quo during the stop.  Even though this case did not involve a situation that was overtly dangerous, such as "a dark and deserted spot or one lone officer facing a carful of suspects, our reluctance to second-guess the judgment of experienced officers is not limited to such extreme situations."  White, 649 F.2d at 36 (footnote deleted).  Moreover, the additional intrusion upon Alston's personal liberty was minimal.  We conclude, therefore, that Hixson acted reasonably in asking Alston to get back in his car in order to control and monitor the situation during the course of the investigatory stop.  See Hatcher, 14 Va. App. at 491-92, 419 S.E.2d at 259.

Thereafter, Officer Hixson, in approaching Alston's car to investigate the suspected trespassing and Alston's possible criminal involvement, saw a "box of open sandwich baggies" and an open container of beer in plain view in the center console of the car and detected an odor of marijuana emanating from the car.  Based on those observations, Hixson had a reasonable and articulable suspicion that justified further investigation of Alston's suspected criminal activity.  Hixson's subsequent discovery that there was an outstanding warrant for Alston then provided the officer with the probable cause necessary to arrest Alston.  Incident to that arrest, the police conducted a search

that led to the discovery of the marijuana on Alston's person and in his car.

We hold, therefore, based upon our de novo review, that, under the facts and circumstances of this case, the trial court did not err in denying Alston's motion to suppress.

Accordingly, we affirm Alston's conviction.

Affirmed.