COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Decker and Senior Judge Haley
Argued by teleconference

COMMONWEALTH OF VIRGINIA

v.        Record No. 2068-17-2

AMIR FAREED SULUKI

MEMORANDUM OPINION* BY
JUDGE MARLA GRAFF DECKER
JUNE 5, 2018

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Clarence N. Jenkins, Jr., Judge

Brittany A. Dunn-Pirio, Assistant Attorney General (Mark R.
Herring, Attorney General, on briefs), for appellant.

Lauren Whitley, Deputy Public Defender, for appellee.


Amir Fareed Suluki (the defendant) was indicted for robbery, use of a firearm in the

commission of robbery, and possession of a firearm by a violent felon, in violation of Code

§§ 18.2-58, -53.1, and -308.2. The defendant filed a pretrial motion to suppress evidence, which he

alleged was obtained during an unlawful search. After a hearing, the circuit court granted the

motion and suppressed the evidence. Pursuant to Code §§ 19.2-398 and -400, the Commonwealth

appeals that pretrial ruling. The Commonwealth contends that the discovery of the evidence was

reasonable under the Fourth Amendment to the United States Constitution because, among other

things, the defendant was lawfully handcuffed during an investigative detention and his resistance to

the efforts to handcuff him provided probable cause to arrest for obstruction of justice, thereby

legitimizing the search of his person and the bundle he was carrying. The record, viewed under the

appropriate standard, supports the conclusion that the circuit court erred as a matter of law by

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

rejecting this analysis. Consequently, we reverse the circuit court's ruling suppressing the evidence and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND[1]

At 4:46 p.m. on June 28, 2017, Officer Cole Kelly of the City of Richmond Police Department was dispatched in response to a "hold-up" alarm notification from a convenience store. He arrived at the store within sixty to ninety seconds.[2] Kelly received information indicating that a tall male of a particular race, who was armed with a gun and wore a black mask, ran out of the store. The store's cashier told Kelly that the robber "took all [the] money" and was wearing "all black." The cashier also said that he knew who the perpetrator was. Another man at the store reported to Officer Kelly that he also knew the robber and had just seen him "on T Street." Less than a minute after Officer Kelly arrived at the store, he was back in his marked police car traveling toward T Street.

As Kelly arrived in the area two to three blocks away, he saw someone who matched the armed robber's description entering an apartment building. Kelly parked and got out of his car without activating any of its emergency equipment. As the man, the defendant, looked back toward Kelly, the officer motioned to him to come outside the building. The defendant complied and spoke with Kelly, the only officer present at the time, just outside the doors of the apartment

---

[1] On review of a ruling on a motion to suppress, this Court views the evidence in the light most favorable to the party who prevailed below, in this case the defendant. See Commonwealth v. Smith, 281 Va. 582, 588, 709 S.E.2d 139, 141 (2011). This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." Scott v. Commonwealth, 68 Va. App. 452, 458, 809 S.E.2d 254, 257 (2018) (quoting McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc)).

[2] Kelly was wearing a body camera at the time, and his entire investigation of the incident was recorded. At the defendant's request, the body camera video was admitted into evidence without limitation.

building.[3]  During the interaction, the defendant held a "bundle" in his left hand that consisted of a black sweatshirt or jacket wrapped around a white plastic bag.[4]  An older man with a cane stood nearby during the encounter.

Officer Kelly asked the defendant if he was "just out on T Street."  The defendant said no and that he was "[t]here to see [his] father."  Officer Kelly replied that he had seen the defendant "just coming away from T Street" and someone "said there was a guy wearing all black," adding that the defendant was "not in trouble."  The defendant, pointing toward T Street, then said, "Oh, I came from right there, talking to the old schools on the corner."  Officer Kelly asked if the defendant had "a mask or anything like that" in his bundle.  The defendant politely replied, "No, sir."  He looked the officer in the eyes as he did so and expressed no surprise regarding the question.

Kelly then asked the defendant if he could "check" the bundle.  The defendant replied much more emphatically, "Why?  I don't have anything."  Officer Kelly responded that it was because the defendant had a black hoodie, black shirt, and black pants.  Kelly then specifically asked what the defendant had "in the bag."  The defendant said, "What," looked down at the bundle, and continued, "This [is] my, um, my food, I'm trying to keep it cause it's *hot*."  Kelly asked, "Ok, what is it?"  The defendant refused to tell him, stating twice that "[i]t doesn't matter what it is."  Kelly asked to "see" the contents of the bag, and the defendant again refused.

---

[3] The body camera video shows that about three minutes passed from the time that Kelly received the call about the robbery to the time that he arrived at the apartment building.

[4] Officer Kelly testified that it was a hot day and that the defendant was "profusely sweating from his face area."  The judge, who viewed the video, expressly rejected Officer Kelly's characterization that the defendant was sweating profusely.  He also rejected Kelly's testimony that the defendant was "wearing all black clothing," finding that the defendant's pants were gray.  Based on the contents of the video, the circuit court's findings are not plainly wrong.

At that point, Officer Kelly saw an additional police car pulling up to the curb in front of the apartment building. Kelly said to the defendant, "Just come here," and told him to "put [his] hands behind [his] back for a second." Kelly simultaneously moved behind the defendant, who turned and positioned his left hand, which still held the bundle, away from the officer. At the same time, Kelly's back-up, Officers Morley and Ellerbe, walked up to the defendant. Officer Kelly pulled the defendant's right arm behind his back, but the defendant continued to hold the bundle in his left hand in front of his body.[5] Officer Morley told the defendant that she would "tase [him] if [he did] anything stupid."[6] Officer Kelly, speaking simultaneously with Officer Morley, again told the defendant to put his "hand" behind his back "right now, ok?" Officer Morley said, "Drop it, drop it, drop what's in your hand [or] I'm gonna tase you right now, man." The defendant told the officers not to tase him. Officer Kelly responded much more emphatically, "Put your hand behind your back and it won't happen, all right?" The defendant again said, "Don't tase me," and kept his left hand, in which he still held the bundle, away from the officer.[7] An elderly bystander remained nearby at the time. The defendant then said, "All right, look, I'm gonna drop it, . . . don't tase me." When he did not do so immediately, Officer Morley said in a louder and more emphatic manner, "drop it, drop it," and she then fired the taser.

---

[5] Officer Kelly testified that he "could feel [the defendant's] body becoming stiff and rigid" as he attempted to handcuff the defendant. The trial court, however, found that the video did not support Kelly's testimony that the defendant stiffened his body, implicitly rejecting this testimony. This finding is not plainly wrong.

[6] The video shows that Officer Morley had nothing in her hands when she first arrived at the scene. It further reflects the presence of a total of three officers during this period of time—Kelly, Morley, and Ellerbe.

[7] The judge stated, "The Court did not note any situation [in the video] where an arm was pulled, where the defendant pulled his arm from behind his back or tried to yank away or anything of that sort." This finding is not plainly wrong.

- 4 -

The defendant dropped the bundle, and Officer Kelly struggled to get both of the defendant's hands behind his back to handcuff him. As he did so, Officer Morley moved the bundle away with her foot, and Officer Ellerbe picked it up and moved it to a nearby ledge.[8] Police subsequently searched the defendant's person and the bundle and found evidence, including a mask and firearm, that the defendant sought to suppress.[9]

At the suppression hearing, Officer Kelly testified that he "absolutely" wanted to "put [the defendant] into investigative detention to . . . investigate further" regarding the robbery. He said that he did not do so immediately, while on the scene by himself, for safety reasons. He further explained that the defendant was bigger and taller than he and his back-up officers were and he knew the robbery suspect had been reported to have a gun. Kelly also testified that the defendant's resistance to putting his hands behind his back impeded him from placing the defendant safely under detention to investigate the robbery.[10]

After hearing evidence and argument on the motion to suppress, the circuit court ruled that based on the defendant's appearance, the officer had reasonable, articulable suspicion to believe that he was the person who robbed the store. The court found that the two then engaged in "normal conversation" during which the defendant was polite. The court further held that the encounter quickly "went from [Kelly's] asking [the defendant] a basic question to basically placing him into custody." Additionally, it found that the officers escalated the situation when

---

[8] Officer Ellerbe testified that she could not see inside the bag after it fell but that when she picked it up to move it to the ledge, she noticed that it "felt . . . weighted."

[9] The defendant also made a motion to suppress identification testimony from a store employee. The judge ruled that the employee's testimony was tainted by his prior viewing of the defendant's photograph, rendering his identification inadmissible. That ruling is not before this Court on appeal.

[10] The record reflects that one of the charges for which Kelly arrested the defendant was obstruction of justice. The video shows that the defendant engaged in obstructive behavior both before and after he was handcuffed.

Kelly placed the defendant's arm behind his back because one of the officers told the defendant, "[I]f you don't comply[,] I will tase you." The court found that the defendant stated, "I'm putting the bag down," and was immediately tased.

The court ruled that the officers' actions amounted to an arrest for which they lacked probable cause. The judge elaborated, "I don't think what we saw rises to the level of obstructing of justice." He stated, "[B]y the time it got to that point, the [original] officer had multiple officers around him in order to conduct a pat down," implying that handcuffing the defendant was not justified in light of the presence of additional officers. Consequently, the circuit court granted the motion to suppress the evidence.[11]

## II. ANALYSIS

The Commonwealth contends that the circuit court erred in granting the defendant's motion to suppress the evidence found during the robbery investigation. It suggests in relevant part that the officers lawfully sought to handcuff the defendant during an investigatory stop and that the defendant's resistance, viewed under the proper standard, provided probable cause to arrest him for obstruction of justice. Accordingly, it argues that the existence of probable cause to arrest, viewed objectively, permitted a search of the defendant and his bundle.

On appeal of an order granting a defendant's motion to suppress, the Commonwealth has the burden to show that the ruling constitutes reversible error. See Murphy v. Commonwealth, 264 Va. 568, 573, 570 S.E.2d 836, 838 (2002). The evidence is viewed in the light most favorable to the defendant, the party who prevailed below. See Commonwealth v. Peterson, 15 Va. App. 486, 487, 424 S.E.2d 722, 723 (1992). Further, the appellate court is bound by the circuit court's findings of fact unless "plainly wrong or without evidence to support them."

---

[11] The court also found that the discovery of the mask and firearm on the defendant's person and in his bundle exceeded the scope of a pat down for weapons. Additionally, it rejected the Commonwealth's argument that the items would inevitably have been discovered.

Gregory v. Commonwealth, 64 Va. App. 87, 93, 764 S.E.2d 732, 735 (2014). However, "'[u]ltimate questions of reasonable suspicion and probable cause to make a warrantless search' involve questions of both law and fact and are reviewed *de novo* on appeal." McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (*en banc*) (quoting Ornelas v. United States, 517 U.S. 690, 691 (1996)). In making such determinations, we "give deference to the factual findings of the [circuit] court and independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." Murphy, 264 Va. at 573, 570 S.E.2d at 838. Ultimately, we note that the suppression of evidence "has always been our last resort, not our first impulse." Freeman v. Commonwealth, 65 Va. App. 407, 420, 778 S.E.2d 519, 525 (2015) (quoting Herring v. United States, 555 U.S. 135, 140 (2009)).

## A. Proper Scope of a Terry Stop

We first consider the investigative detention and its scope. "[A] police officer may, without violating the Fourth Amendment, make a brief investigatory stop of a person when the officer has reasonable suspicion, based on objective facts, that criminal activity may be afoot." Mason v. Commonwealth, 291 Va. 362, 367, 786 S.E.2d 148, 151 (2016); see Terry v. Ohio, 392 U.S. 1, 30 (1968). Here, Officer Kelly detained the defendant for the purpose of investigating whether he had committed an armed robbery just minutes earlier at a location a few blocks away. It is undisputed for purposes of this pretrial appeal that Kelly had reasonable suspicion to believe that the defendant might be the robber. The circuit court so held, and the record supports that ruling. See, e.g., Blevins v. Commonwealth, 40 Va. App. 412, 419, 422, 579 S.E.2d 658, 661, 663 (2003). Accordingly, we proceed to examine the scope of that detention.

Police conducting an investigatory stop may ask a suspect "to explain suspicious circumstances." United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975), cited with

approval in Ford v. Commonwealth, 28 Va. App. 249, 257, 503 S.E.2d 803, 806 (1998). However, "[a] police officer [is] not . . . required to ask of a person whom he reasonably suspects is engaging in criminal activity . . . to explain his conduct and run the risk of receiving a bullet in answer to his questions." Simmons v. Commonwealth, 217 Va. 552, 556, 231 S.E.2d 218, 221 (1977). "While the 'investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time,' the 'scope of the intrusion permitted will vary [with each case].'" Thomas v. Commonwealth, 16 Va. App. 851, 856-57, 434 S.E.2d 319, 323 (1993) (alteration in original) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)), adopted upon reh'g en banc, 18 Va. App. 454, 455, 444 S.E.2d 275, 276 (1994). The means must be "reasonably related in scope to the circumstances which justified the interference in the first place." Hiibel v. Sixth Jud. Dist. Ct., 542 U.S. 177, 185 (2004) (quoting United States v. Sharpe, 470 U.S. 675, 682 (1985)).

Additionally, "[o]nce an officer has lawfully stopped a suspect, he is 'authorized to take such steps as [are] reasonably necessary to protect [his and others'] personal safety and to maintain the status quo during the course of the stop.'" Servis v. Commonwealth, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988) (second and third alterations in original) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). "Brief, complete deprivations of a suspect's liberty," including handcuffing and the drawing of weapons, "'do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.'" Thomas, 16 Va. App. at 857, 434 S.E.2d at 323 (quoting United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989)); see Crittendon, 883 F.2d at 329 (approving the reasonable display of weapons).

Finally, "[r]easonableness is judged from the perspective of a[n objectively] reasonable officer on the scene allowing for the need of split-second decisions and without regard to the

officer's [subjective] intent or motivation." Thompson v. Commonwealth, 54 Va. App. 1, 7, 675 S.E.2d 832, 834-35 (2009) (quoting Scott v. Commonwealth, 20 Va. App. 725, 727, 460 S.E.2d 610, 612 (1995)). Whether the degree of restraint was reasonable is ultimately a question of law reviewed *de novo*. See Murphy, 264 Va. at 573, 570 S.E.2d at 838 (noting that the overarching question of whether an action is reasonable under the Fourth Amendment is a question of law); Thomas, 16 Va. App. at 857, 434 S.E.2d at 323 (permitting handcuffing during a detention if doing so is "reasonable" under the circumstances (quoting Crittendon, 883 F.2d at 329)).

We hold that handcuffing the defendant and displaying the taser were objectively reasonable under the Fourth Amendment on the facts of the case, viewed in the light most favorable to the defendant. During the course of the stop, Officer Kelly gathered information adding to a reasonable belief that the defendant was the person who just robbed the nearby convenience store with a firearm and might still have the firearm in his possession. Minutes after the robbery, the officer approached the defendant as he was entering a building and engaged in a discussion just outside. Prior to handcuffing the defendant, the officer observed that he was of the same race as the armed robber and was wearing dark clothing resembling the clothing that the robber was reported to have been wearing. Officer Kelly asked the defendant if he had been on T Street. The defendant initially said, "No," and rather than explaining that he had taken a different route to the apartment building, he volunteered, "I'm here to see my father." When Officer Kelly noted that he had observed the defendant "just coming away from T Street," the defendant admitted that he had, in fact, just been "on the corner." This admission conflicted with the defendant's original denial, and it was consistent with the statement of the unnamed man at the store to Officer Kelly that he had just seen the perpetrator of the armed robbery on the corner of T Street.

Kelly then directed his attention to the bundle that the defendant was carrying, which consisted of the white plastic bag wrapped in the black jacket or hoodie. He asked the defendant if he had "anything . . . like a mask" in the bundle, an inquiry that was reasonably related to the purpose of the stop. The defendant calmly replied, "No, sir." Although Officer Kelly had previously implied that he was looking for "a guy wearing all black," he had not told the defendant *why* he was looking for a person meeting that description or that the person was a suspect in an armed robbery. Despite this lack of information, the defendant did not hesitate or express puzzlement regarding the reason for Kelly's question about whether he was carrying a mask on a hot summer day.

The video also shows that once Kelly asked the defendant, "[D]o you mind if I check [the bundle]," the defendant's demeanor changed markedly. He gestured by spreading his hands and responded much more emphatically, "Why? I don't have anything." When the officer asked about what was in the bundle, the defendant replied, "What," and then looked noticeably down at the bundle as he replied, "This [is] my, um, my food, I'm trying to keep it 'cause it's *hot*." Kelly replied, "Okay, what is it?" The defendant said, "'Scuse me?" and Officer Kelly asked, "What's the food?" The defendant answered in a voice that rose in pitch. Rather than simply telling Officer Kelly what type of food he was carrying, he responded twice, "It doesn't matter what it is." When Kelly then asked the defendant to just let him see what he had, the defendant twice refused. Finally, when Officer Kelly instructed the defendant to "come here," moved toward him, and told him to put his hands behind his back, the defendant turned and moved his left hand, in which he still held the bundle, away from Officer Kelly. See, e.g., Washington v. Lambert, 98 F.3d 1181, 1188-89 (9th Cir. 1996) (holding that in determining whether handcuffing a suspect or drawing weapons during an investigative detention is reasonable, a court may consider factors such as whether the police "have information that the suspect is

- 10 -

currently armed" or whether "the stop closely follows a violent crime"); United States v. Bautista, 684 F.2d 1286, 1290 (9th Cir. 1982) (noting that handcuffing a suspect "eliminate[s] the possibility of an assault or escape attempt during . . . questioning, particularly if an arrest bec[o]me[s] imminent").

Even if the defendant, as he suggests, was not required to show the contents of his bundle to Officer Kelly during the course of the Terry stop,[12] his refusal to do so despite his claim that its contents were innocuous provided additional circumstances tending to confirm rather than dispel suspicion that the defendant was the armed robber and that he could still have the firearm in his possession, thereby posing a safety threat to the officers and the bystander. See generally Purdie v. Commonwealth, 36 Va. App. 178, 186, 549 S.E.2d 33, 37 (2001) (noting that the totality of the circumstances analysis may include "suspicious conduct" involving "something that had been . . . in [the defendant's] hand"); 2 Wayne R. LaFave, Search and Seizure § 3.6(d), at 438-40 (5th ed. 2012) (stating that a suspect's effort to conceal an object may be a factor in assessing whether a search or seizure of the person or object was reasonable). The fact that two other officers were present, one of whom was armed with a taser, may have reduced but did not remove the threat that the defendant's possession of a weapon would have posed.[13]

These circumstances—which are depicted in the video—support the conclusion, as a matter of law, that handcuffing the defendant and displaying the taser for at least the duration of a weapons frisk were reasonable under the Fourth Amendment. See, e.g., United States v. Smith,

---

[12] "The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" Commonwealth v. Swann, 290 Va. 194, 196, 776 S.E.2d 265, 267 (2015) (quoting McGhee v. Commonwealth, 280 Va. 620, 626 n.4, 701 S.E.2d 58, 61 n.4 (2010)). Due to the decisional approach we employ, we do not address whether an examination of the bundle and its contents would have been reasonable pursuant to the Terry stop. See Jones v. Commonwealth, 52 Va. App. 548, 567-68, 665 S.E.2d 261, 271 (2008).

[13] The defendant conceded at oral argument on appeal that only two other officers were present with Kelly during this period of time.

697 F.3d 625, 628-29, 632 (7th Cir. 2012) (holding that pointing a gun at and then handcuffing an individual suspected of committing armed robbery two hours before the investigative detention was reasonable because he could still be armed); see also Alston v. Commonwealth, 40 Va. App. 728, 742, 581 S.E.2d 245, 252 (2003) (holding that the mere "perception . . . that one is [in custody] is insufficient to convert a Terry stop into an arrest" (alteration in original) (quoting United States v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1987))). Further, because these methods of restraint were reasonable, the encounter remained a lawful detention rather than an unlawful arrest, and the defendant was not entitled to resist. See Commonwealth v. Hill, 264 Va. 541, 547-48, 570 S.E.2d 805, 808-09 (2002).

### B. Probable Cause to Arrest for Obstruction of Justice

The Commonwealth further argues that the circuit court erred in ruling that the defendant's resistance to being handcuffed did not provide probable cause to arrest him for obstructing justice.

Probable cause to believe a crime has occurred involves a much lower evidentiary standard than proof beyond a reasonable doubt. E.g., Maryland v. Pringle, 540 U.S. 366, 371 (2003); see Doscoli v. Commonwealth, 66 Va. App. 419, 427, 786 S.E.2d 472, 477 (2016) (stating that "[f]inely tuned standards" like proof beyond a reasonable doubt or by a preponderance "have no place" in analyzing probable cause (quoting Pringle, 540 U.S. at 371)). "Probable cause 'is not a high bar.'" District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Kaley v. United States, 134 S. Ct. 1090, 1103 (2014)). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" Id. (quoting Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983)). Additionally, probable cause is judged by "examin[ing] the events leading up to the arrest[] and then decid[ing] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,'" meet the requisite standard. Id. (quoting Pringle, 540 U.S. at 371); see also Mason, 291 Va. at 369, 786 S.E.2d at

152 (noting that although probable cause must be based on "[a]rticulable" facts, the officer need not articulate those facts expressly or subjectively rely on them as the basis for his actions).

If the facts establish probable cause to arrest, law enforcement may conduct a search of the arrestee's person incident to that arrest. See, e.g., Joyce v. Commonwealth, 56 Va. App. 646, 657, 696 S.E.2d 237, 242 (2010). It does not matter that "the formal arrest follow[s] quickly on the heels" of the search as long as the officer had probable cause to arrest at the time of the search. Id. (alteration in original) (quoting Rawlings v. Kentucky, 448 U.S. 98, 111 (1980)).

Code § 18.2-460(A), in relevant part, provides that "[i]f any person without just cause knowingly obstructs . . . any law-enforcement officer . . . in the performance of his duties" or "fails or refuses without just cause to cease such obstruction when requested to do so," he is "guilty of a Class 1 misdemeanor." This subsection does not require proof of threats or force. Compare Code § 18.2-460(A), with Code § 18.2-460(B), (C). It requires proof only of acts "indicating an intention on the part of the accused to prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action." Ruckman v. Commonwealth, 28 Va. App. 428, 429, 505 S.E.2d 388, 389 (1998) (quoting Jones v. Commonwealth, 141 Va. 471, 479, 126 S.E. 74, 77 (1925)); see Thorne v. Commonwealth, 66 Va. App. 248, 255, 784 S.E.2d 304, 308 (2016) (holding that "direct obstruction" includes circumstances in which "the officer seeks to make the defendant act directly and the defendant refuses or fails to act as required" (quoting DiPino v. Davis, 729 A.2d 354, 361-62 (Md. 1999))).

Here, the evidence, viewed objectively and in the light most favorable to the defendant, establishes probable cause to arrest as a matter of law. The video clearly shows that the defendant refused Officer Kelly's first direction to him to "come here" and then to "[p]ut [his] hands behind [his] back for a second." Officer Kelly then grabbed the defendant's right arm and pulled it behind his back, but the defendant kept his left hand in front of his body, still gripping

- 13 -

the bundle. Additionally, the video shows that despite being instructed three times over a period of thirteen seconds to put his hands behind his back, five times to drop the bundle he was holding, and twice that he would be tased if he did not do so, each time in a tone of increasing urgency, the defendant failed to comply for a period of thirteen seconds. Cf. Thorne, 66 Va. App. at 257-58, 784 S.E.2d at 309 (holding that the appellant's repeated refusal to roll down her car window to allow an officer to investigate the degree of tint and to see for safety purposes who was inside the vehicle supported her conviction for obstruction of justice). Although the defendant stated "don't tase me" and "I'm gonna drop it," the video reflects that he did not do so. Consequently, the record, viewed under the proper standard, establishes probable cause to believe that the defendant was obstructing justice.[14] This provided an objectively reasonable basis for conducting a search before the arrest was formally effected.[15]

### III. CONCLUSION

We hold that the totality of the circumstances, including those shown in the body camera video recording, viewed under the proper standard, supported displaying the taser and handcuffing the defendant until the officers could conduct a weapons frisk. Additionally, the objective evidence of the defendant's resistance to being handcuffed provided probable cause for his arrest for obstruction of justice, legitimizing a search incident to arrest. Consequently, we reverse the circuit court's ruling suppressing the challenged evidence, and we remand the case for further proceedings consistent with this opinion.

Reversed and remanded.

---

[14] The actual firing of the taser occurred only after the behavior that constituted obstruction of justice, and the defendant does not suggest that its use impacted the existence of probable cause to search his person and bundle.

[15] The defendant did not argue below and does not contend on appeal that the search of his person or the bundle was unreasonable if the officers had probable cause to arrest him for obstruction of justice. Consequently, we do not consider that issue.